UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| CALVIN LEWIS, JR., ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | 1:21-cv-00224-GZS |
| ) | |
| T-MOBILE USA, INC., ) | |
| ) | |
| Defendant ) | |

### RECOMMENDED DECISION ON
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff alleges Defendant, Plaintiff's former employer, discriminated against him in connection with his employment in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(a).[1]  Defendant moves for summary judgment. (Defendant's Motion, ECF No. 34.)

Following a review of the summary judgment record and after consideration of the parties' arguments, I recommend the Court grant in part and deny in part Defendant's motion.

### LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "After the moving party has presented evidence in support

---

[1] Plaintiff also claimed Defendant discriminated against him in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634.  The Court previously dismissed Plaintiff's ADEA claim. (Recommended Decision, ECF No. 13; Order Affirming Recommended Decision, ECF No. 15.)

of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015). If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of the claims, a trial-worthy controversy exists, and summary judgment must be denied as to any supported claim. *Id.* at 78 ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)). Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

## BACKGROUND

In 2018, Defendant promoted Plaintiff, who began working for Defendant in 2005, to a Coach, Team of Experts (TEX) position at a call center in Maine. (Defendant's Statement of Material Facts (DSMF) ¶¶ 1, 2, ECF No. 35.) Defendant's job description for the position provides that physical attendance at the call center is a requirement of the job. (*Id.* ¶ 3.) Defendant characterizes the Coach, TEX position as an interactive, high stress job.[2] (*Id.* ¶ 9.) Plaintiff lists his job duties as communicating with the ten employees

---

[2] According to the job description, a Coach, TEX's "Main Responsibility" is to "motivate and inspire their team" by being leaders who "demonstrate strong interpersonal, time management, and multitasking skills"

on his team, instructing them on how to be successful, communicating incentives to them, and reporting to Defendant regarding his team members' performance. (*Id.* ¶ 10; *see also* Lewis Aff. ¶ 8, ECF No. 38.)

On June 21, 2019, Plaintiff requested a leave of absence until July 11, 2019, due to a flare-up of symptoms of his Post Traumatic Stress Disorder ("PTSD"), which request Defendant granted. (DSMF ¶ 11.) Defendant provides a short-term disability benefit (the benefit) in the form of partial income replacement for employees with serious health conditions. (*Id.* ¶ 12.) Employees may apply for the benefit through a process conducted by Broadspire, Defendant's employee benefits provider. (*Id.*) Broadspire evaluates claims based on applicable laws and plan provisions.[3] (*Id.*)

Plaintiff's healthcare provider completed an application form supporting Plaintiff's request for the benefit on July 23, 2019. (*Id.* ¶ 14.) Plaintiff's provider did not check "yes" in response to the form question asking whether Plaintiff had been directed by a healthcare provider to stop working. The provider, however, wrote that he "did not advise [Plaintiff to stop working] initially, but support[s] [Plaintiff] until he feels he can return" to work. (*Id.* ¶ 15; DSMF Ex. 1-G, PageID #: 293, ECF No. 35-8.) Plaintiff's provider also wrote

---

and "are responsible for building effective working relationships" including "collaboration with other coaches." (*Id.* ¶ 7.) Approximately 25% of a coach's time is dedicated to "providing effective feedback, coaching, and supporting" team members, 10% is spent "provid[ing] meaningful career and professional development for assigned experts; coach[ing] and develop[ing] experts, including inspection and observation of expected behaviors and outcomes; actively engag[ing] in day-to-day activities in the pod and being a trusted resources for experts through in-the-game coaching" and 20% is spent "[c]oordinating, cooperat[ing], and collaborat[ing] with other coaches." (*Id.* ¶ 8.)

[3] Under Defendant's benefit plan, "Total Disability or Totally Disabled" means an employee is prevented by injury, sickness, mental illness, substance abuse, or pregnancy, from performing the essential duties of the employee's occupation. (*Id.* ¶ 13.)

that Plaintiff was expected to return to work by August 10, 2019, but that Plaintiff might need additional breaks depending on flare-ups in his PTSD symptoms.  (DSMF Ex. 1-G, PageID #: 294.)  He noted Plaintiff's reasoning and/or judgment would be impaired when Plaintiff is symptomatic.  (*Id.*, PageID #: 295.)

Broadspire denied Plaintiff's claim for the wage replacement benefit, concluding after review of Plaintiff's claim that there "was a lack of clinical evidence to support [Plaintiff's] inability to perform the essential duties of [his] occupation."  (*Id.* 16.)  Defendant placed Plaintiff on an unpaid leave of absence. (*Id.* ¶ 48.)

On December 10, 2019, Plaintiff's provider approved Plaintiff's return to work.  (*Id.* ¶ 24.)  Plaintiff returned to work on December 18, 2019, but he experienced a panic attack and had to leave.  (*Id.* ¶ 25.)  He did not return to work after the panic attack.  (*Id.* ¶ 26.)

On December 31, 2019, Plaintiff's new healthcare provider submitted a completed questionnaire for intermittent leave form.  (*Id.* ¶ 27.)  On the questionnaire, the provider checked "yes" to the following impairments as limiting Plaintiff's performance of his job duties: concentration, interacting with others, sleeping, eating, breathing, and digestive. (*Id.* ¶ 28.)  When asked to identify the essential functions of the job that Plaintiff was unable to perform without an accommodation, she wrote "coaching, trainings, payroll, self + group training, chair meetings;" she explained that Plaintiff could not perform the functions "because of severe anxiety and times of PTSD."  (*Id.* ¶ 29.)  She asserted that Plaintiff would need an accommodation to help him perform his essential job functions until she "recertified" him to return to work on January 17, 2020. (DSMF Ex. 1K, PageID #: 323, ECF No. 35-12.)  In response to the question "[i]f T-Mobile is unable to accommodate all

4

or some of the requested intermittent time away from work, would a continuous leave of absence enable the employee to return to work and perform his/her essential functions," the provider checked "yes." (DSMF ¶ 30.) She also stated that Plaintiff could perform the essential functions of his job if he were permitted to "work from home or [a] different call center." (DSMF Ex. 1K, PageID #: 324.)

On January 15, 2020, Plaintiff requested an accommodation to work remotely. (DSMF ¶¶ 31, 33.) Plaintiff informed Defendant he wanted to complete "training and modules" at home rather than at work. (*Id.* ¶ 33.) Plaintiff asserts another group of coaches and TEXs, known as T-Force, worked from home. (Lewis Aff. ¶ 3 & Ex. 10, ECF No. 38-10.) Defendant's human resources department (HR) informed Plaintiff that he needed to be onsite to coach his team, but that because he was a salaried employee, he could complete the training modules after hours, on the weekends, or prior to the start of his shift. (DSMF ¶ 35.) Defendant only requires that an employee re-train before returning to work if the employee had been out on continuous leave for at least one year. (*Id.* ¶ 36.) HR explained to Plaintiff that because he was out on leave for six months, he was not required to retrain before he returned to work.[4] (*Id.* ¶ 37.)

---

[4] For employees out on leave for less than one year the expectation was that they complete any training during their regularly scheduled shifts; employees were not expected to be "offline" to complete the training. (*Id.* ¶ 38.) Plaintiff is unaware of any other employees who requested a work-from-home arrangement who were required to perform training. (*Id.* ¶ 39.) Defendant asserts that the training modules at issue would have taken less than one day to complete, and that Plaintiff had several weeks to complete them. (*Id.* ¶ 47.) Plaintiff disputes Defendant's assertion. (*See* Lewis Aff. Ex. 4, ECF No. 38-4.). Plaintiff acknowledged that he was able to complete most of the training modules at home, until he was placed on an unpaid leave of absence. (DSMF ¶ 48.)

At a meeting between HR personnel and Plaintiff on January 22, 2020, Plaintiff and the HR attendees disagreed on the amount of work Plaintiff performed after his leave ended on January 17. (*Id.* ¶ 40; Lewis Aff. Ex. 3, ECF No. 38-3.) Plaintiff believed he was entitled to an accommodation immediately upon submission of his request. (DSMF ¶ 41.) Plaintiff's understanding was based on his experience obtaining an accommodation shortly after requesting it. (Lewis Aff. ¶ 4.) Defendant does not provide temporary accommodations while working through the accommodation process. (*Id.* ¶ 32.) HR asked Plaintiff to clarify what he was seeking through the accommodation process. (*Id.* ¶ 42.) HR explained to Plaintiff that Defendant needed to know the job responsibilities he was having difficulty performing due to his disability and the accommodations a physician believed would benefit him. (DSMF ¶ 43.)

Defendant asserts Plaintiff became agitated during the meeting and maintained that because HR required information from his healthcare provider first, he believed HR was denying his request for an accommodation. (*Id.* ¶ 44.) Plaintiff believed the process would delay confirmation of his requested accommodation. (Lewis Aff. ¶ 6.) HR informed Plaintiff that it was not denying a request for accommodation but was instead engaging in the interactive process, and that additional information from his provider was required to understand his needs. (*Id.* ¶ 45.) According to Defendant, Plaintiff reported that the accommodation was only needed through January 31, 2020, but he could not explain the significance of the date to HR as it related to his workplace accommodation needs. (*Id.* ¶ 46.) Plaintiff maintains he was unsure about the exact end date and needed to complete

the form with his provider to determine the time for which the accommodation would be necessary. (Lewis Aff. ¶ 7.)

On January 22, 2020, HR met with Plaintiff and asked him to clarify his request for an accommodation. (DSMF ¶ 74.) Plaintiff replied that he was a veteran who had a disability and wanted to know what Defendant was going to do for him. (*Id.*) Plaintiff contends he was attempting to learn whether disabled veterans had any different benefits. (Lewis Aff. ¶ 9.)

On January 23, 2020, Defendant received a document entitled "Cognitive & Behavior Capacities Form" from Plaintiff's healthcare provider. (DSMF ¶ 49.) The provider opined that Plaintiff had a temporary impairment, until February 17, 2020, which restricted his ability to: 1) effectively learn and master information in a classroom setting; 2) effectively learn and master information from on-the-job training; 3) think critically and make sound decisions; 4) maintain emotional control and organization under stress; and 5) maintain socially-appropriate affect, temperament, and behavior. (*Id.* ¶ 50.) She explained that Plaintiff's impairment in learning and processing was due to a "toxic work environment." (*Id.* ¶ 51.) She also reported that Plaintiff's belief that he was being discriminated against contributed to the impairment of his ability to demonstrate appropriate behavior in the workplace. (*Id.* ¶ 51.)

On a "Health Care Provider Questionnaire" dated January 23, 2020, Plaintiff's provider stated that Plaintiff could perform his job functions with the accommodation of "only do[ing] training on site, reassignment to different location, or work[ing] mostly at home." (*Id.* ¶ 52.) She also answered "yes" to a form question as to whether she had any

7

recommendation regarding accommodations that would enable Plaintiff to perform his job functions, underlining the given examples of "modification of work schedule" and "reassignment to a different position." (*Id.*, Ex. 1R, PageID #: 426, ECF No. 35-19.) Concerning Plaintiff's job functions, she responded to form questions as follows:

> Would the employee performing any of the job functions listed in the job description result in a direct safety or health threat to this employee or other people (co-workers, customers, members of the general public, etc.)? *Yes* If yes, please describe: *On 12-18-19 suffered severe panic attack confirmed by physician*
>
> Which job function(s) would pose such a threat: *training, coaching & development*
>
> The direct safety or health threat posed and severity of the threat: *loss of consciousness, disorientation, panic, ptsd, flare up*
>
> The duration of the safety or health threat: *from 1-3-20 to 2-17-20*
>
> Any accommodation that would eliminate the direct safety or health threat, or reduce it to an acceptable level: *work from home temporarily*
>
> Whether the above opinions are based on current, objectively verifiable information about the risks associated with the employee's impairment: *yes.*

(*Id.* ¶ 53.) She determined that Plaintiff could not perform the job functions because of his "severe anxiety and times of PTSD[,] to include feelings of discrimination." (*Id.*, Ex. 1R, PageID #: 425.) She did not recommend a leave of absence. (*Id*, Ex. 1R, PageID #: 426.) On a telecommuting accommodation request form also completed on January 23, she stated that there were no other accommodations beyond remote work that would enable Plaintiff to perform the essential functions of his job.[5] (*Id.* ¶ 54.)

---

[5] Plaintiff testified at deposition that he agreed with ninety-nine percent of what his provider had submitted, but he felt that her statement that he should work mostly from home but do training onsite was contradictory. (*Id.* ¶ 56.) Plaintiff never clarified the contradiction to anyone at Broadspire or Defendant. (*Id.* ¶ 57.) On

8

Defendant maintains that in December 2019 and January 2020, Plaintiff was not interacting with his team in any capacity. (*Id.* ¶ 60.)  Plaintiff contends that he sporadically worked onsite with his team.  (Plaintiff's Response to DSMF ¶ 60, ECF No. 37; Lewis Aff. Ex. 3, ECF No. 38-3.)  Plaintiff worked remotely at times from January 23, 2020, to February 14, 2020, even though he had not been granted a remote work arrangement. (DSMF ¶ 61.)  During this time, other than the coaching modules, Plaintiff did not complete the job duties of the Coach, TEX position.  (*Id.* ¶ 61; Plaintiff's Response to DSMF ¶ 61.) While Plaintiff worked remotely, another employee was responsible for his team.  (DSMF ¶ 62.)

Defendant placed Plaintiff on an unpaid leave of absence in February 2020, to determine, through an independent behavioral examination, whether he could perform the duties of his position.  (*Id.* ¶ 64.)  Plaintiff used his Family and Medical Leave Act intermittent leave from December 18, 2019, to February 14, 2020.  (*Id.* ¶ 69.)  On March 5, 2020, Plaintiff's provider submitted a report to Broadspire in support of Plaintiff's request for a further leave of absence, noting he could not "perform [his] job as it has been" and that he had not been advised to return to work.  (*Id.* ¶ 66.)  The provider answered "yes" to the form question "Did you advise the patient to stop working?" and identified the date of incapacity as January 3, 2020.  (*Id.* ¶ 67.)

---

January 29, 2020, HR sent a request to the provider asking her to verify the authenticity of the documents provided.  (*Id.* ¶ 58.)  On January 30, 2020, the provider verified the documents' authenticity.  (*Id.* ¶ 59.)

9

On April 10, 2020, Plaintiff resumed working after Defendant approved him to work remotely due to the COVID-19 pandemic. (*Id.* ¶ 68.) In June 2020, the Key Performance Index (KPI) of Plaintiff's team was the highest in the company. (Lewis Aff. Ex. 6, ECF No. 38-6.)

When Defendant merged with Sprint, there was a reduction in the workforce generally. (DSMF ¶ 70.) Plaintiff's position was eliminated on June 29, 2020. (Complaint Ex. 1 at 2, ECF No. 1-1.) Defendant informed Plaintiff his employment was terminated due to the merger. (DSMF ¶ 71.)

## DISCUSSION

### A. Denial of Short-term Disability Benefits

Plaintiff claims Defendant's denial of his request for wage replacement benefits from July 11, 2019, to August 10, 2019, violated the ADA. The ADA "forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services programs and activities, which are the subject of Title II; and public accommodations, which are covered by Title III." *Bd. of Tr. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 372 (2001). Plaintiff's claim for unpaid benefits would be considered a claim under Title I.

To prevail on an employment discrimination claim under the ADA, a plaintiff must establish that (1) she or he is disabled within the meaning of the ADA; (2) she or he was qualified to perform the essential functions of the job, either with or without reasonable accommodation; and (3) the employer took an adverse employment action against her or him because of the alleged disability. *Vélez-Ramirez v. P.R. through Secretary of Justice*,

827 F.3d 154, 157 (1st Cir. 2016). Defendant presumes for summary judgment purposes that Plaintiff can make out a prima facie cause for discrimination under the *McDonnell Douglas* analysis, but argues that the record establishes that Defendant had a legitimate non-discriminatory reason (i.e., the lack of corroboration of Plaintiff's inability to work) for denying Plaintiff's request for the wage replacement benefits.[6] The parties dispute whether the records of Plaintiff's healthcare provider corroborate his contention that he could not work.

Plaintiff's claim generates a threshold issue the parties have not addressed in their summary judgment filings – whether an employee or former employee can assert an ADA claim under Title I when the individual contends that he or she cannot work due to a disability. Title I of the ADA provides that "[n]o covered entity shall discriminate against a qualified individual" with a disability because of the disability. 42 U.S.C. § 12112. "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). To obtain the wage replacement benefit under Defendant's short-term disability plan, Plaintiff must demonstrate that during

---

[6] Under *McDonnell Douglas*, if an employee establishes a prima facie case of discrimination, "a rebuttable presumption of discrimination arises, and the burden shifts to the employer to advance a legitimate, nondiscriminatory reason for its actions." *Trahan v. Wayfair Maine, LLC*, 957 F.3d 54, 60 (1st Cir. 2020). The burden on the employer, "is merely a burden of production; the burden of persuasion remains throughout with the employee." *Id.*, 957 F.3d at 60–61. If a defendant proffers a legitimate and nondiscriminatory ground for its actions, a plaintiff can demonstrate pretext by the defendant through circumstantial evidence. The proof can include, "but is not limited to a showing that the employer has proffered different and arguably inconsistent explanations for its decision, unless the record reveals that the real motive was an unstated reason that is nondiscriminatory; probative discriminatory comments; and comparative evidence." *Reyes-Feliciano v. Marshalls*, 159 F. Supp. 3d 297, 306 (D.P.R. 2016) (citations omitted).

the period for which he seeks the benefit, he could not perform the essential functions of the job. If he proves he is entitled to the benefit, he cannot satisfy an element of a Title I ADA claim – that he is a qualified individual because he could perform the essential functions of the job, with or without an accommodation. The issue is thus whether a person such as Plaintiff is a qualified individual entitled to relief under Title I of the ADA. Courts are divided on the issue. *See Hatch v. Pitney Bowes, Inc*., 485 F. Supp. 2d 22, 31-33 (D.R.I. 2007) (collecting cases).[7]

Although the First Circuit has not directly addressed the issue, in *Tompkins v. United Healthcare of New England, Inc*., 203 F.3d 90 (1st Cir. 2000), the First Circuit appeared to distinguish between a claim alleging discrimination in the process by which a benefit determination was made, which might be actionable under the ADA, and a claim alleging the improper denial of benefits. 203 F.3d at 95-96. In affirming the trial court's dismissal of the plaintiff's claim for unpaid benefits, the Court in *Tompkins* noted that the plaintiff had recovered the unpaid benefits and did not allege a "discriminatory denial of any benefit protected by Title I or Title III of the ADA." *Id*. at 96. *Tompkins* suggests the First Circuit might recognize the ability of an employee who could not perform the essential functions of the job to assert a cause of action under Title I of the ADA. The court in *Hatch*, however, after assessing relevant caselaw, was ultimately "persuaded that the First Circuit would

---

[7] *Hatch* and the principal cases discussed in *Hatch* involved claims of former employees who claimed they were disabled and unable to perform the essential functions of the job. Because Plaintiff's claim for wage replacement benefits from July 11, 2019, to August 10, 2019, requires that he demonstrate that he cannot perform the essential functions of the job, regardless of whether Plaintiff is considered an employee or a former employee, his claim presents the same issue.

12

follow the better reasoned approach of the majority of circuit courts and hold that the plain language of Title I of the ADA precludes a claim of employment-based discrimination for disability benefits by a claimant (such as Hatch) who is not a current employee nor able to perform the work of his (former) employee by virtue of his total disability." *Hatch*, 485 F. Supp.2d 22, 28.[8]

Because the record includes evidence (i.e., records from Plaintiff's healthcare provider) from which a factfinder could reasonably conclude that Plaintiff could not perform the essential functions of the job in July 2019, resolution of this threshold issue would likely inform whether Defendant is entitled to summary judgment. Although the Court could conceivably assess the threshold issue and consider whether summary judgment is warranted even though the parties have not directly addressed the issue, the more prudent course is to consider the issue after the parties have had an opportunity to consider and address the issue. *See Oahn Nguyen Chung v. StudentCity.com, Inc.*, 854 F.3d 97, 103 (1st Cir. 2017) (internal quotation marks and citations omitted) ("While a district court may in rare circumstances enter summary judgment on a ground not raised by any party, that power should be exercised sparingly and with great circumspection."). Summary judgment for Defendant on Plaintiff's ADA claim for unpaid wage replacement benefits, therefore, is not warranted at this stage of proceedings.

---

[8] The court acknowledged that some district courts in the circuit, including a judge in the District of Maine, have concluded that such a claim is permissible. *Id.* (citing *Fletcher v. Tufts,* 367 F. Supp. 2d 99, 104-106 (D. Mass. 2005); *Iwata v. Inte. Corp.*, 349 F. Supp. 2d 135, 144-147 (D. Mass. 2004); *Conners v. Maine Medical Center*, 42 F. Supp. 2d 34, 39-45 (D. Me. 1999.)).

B.   **Alleged Discrimination in November 2019**

In his complaint, Plaintiff alleged Defendant engaged in discriminatory conduct against him while he was on unpaid leave in November 2019. In his deposition, however, Plaintiff could not identify, and the record does not otherwise reflect, the discriminatory acts Plaintiff experienced in November 2019 while he was on unpaid leave. (DSMF ¶ 22.) To the extent Plaintiff continues to contend that Defendant violated his rights under the ADA in November 2019, Plaintiff's claim lacks any factual or legal support. Defendant is entitled to summary judgment on the claim.

C.   **Failure to Accommodate Request to Work Remotely**

Defendant argues that it is entitled to summary judgment on Plaintiff's claim that Defendant failed to accommodate his January 2020 request to work remotely. To prove a failure to accommodate claim under the ADA, "a plaintiff must point to sufficient evidence showing that (a) she is disabled within the ADA's definition; that (b) she could perform the job's essential functions either with or without a reasonable accommodation; and that (c) the employer knew of her disability, yet failed to reasonably accommodate it." *Lang v. Wal-Mart Stores East, L.P.*, 813 F.3d 447, 455 (1st Cir. 2016).

Defendant first argues that Plaintiff's request for remote work was not reasonable because the request removed an essential function of his job. "An essential function is one that is 'fundamental' to the position." *Sepúlveda-Vargas v. Caribbean Rests., LLC*, 888 F.3d 549, 553 (1st Cir. 2018). "[T]he complex question of what constitutes an essential job function involves fact-sensitive considerations and must be determined on a case-by-

case basis." *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 25 (1st Cir. 2002). The First Circuit explained that the employer's job description is relevant to the assessment:

> In making this case-by-case determination, the ADA instructs us to give consideration "to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."

*Sepúlveda-Vargas*, 888 F.3d at 553 (quoting 42 U.S.C. §12111(8)).

Here, the job description for Plaintiff's position explicitly states that the employee must be physically present in the call center. (DSMF ¶ 3.) Other factors also inform a court's determination of whether a job function is essential, which factors include the consequences of not requiring the employee perform the function, the experience of past employees in the position, and the current work experience of employees in similar positions. *Sepúlveda-Vargas*, 888 F.3d at 553 (citing 29 C.F.R. § 1630.2(n)(3)).

The record establishes that due to the COVID-19 pandemic, Defendant permitted Plaintiff to work from home from April to June 2020. The record also lacks any evidence to suggest that Plaintiff's or his team's performance suffered during this period compared to their experience working in the call center.[9] Indeed, Plaintiff's team's KPI was evidently

---

[9] Recent EEOC guidance regarding remote work experiences during the pandemic notes that

> [a]ssuming all the requirements for such a reasonable accommodation are satisfied, the temporary telework experience could be relevant to considering [a] renewed request [to work remotely]. In this situation, for example, the period of providing telework because of the COVID-19 pandemic could serve as a trial period that showed whether or not this employee with a disability could satisfactorily perform all essential functions while working remotely, and the employer should consider any new requests in light of this information. As with all accommodation requests, the employee and the employer should engage in a flexible, cooperative interactive process going forward if this issue does arise.

15

the highest in the company in June 2020.  (Lewis Aff. Ex. 6.)  Plaintiff also asserts that Defendant's T-Force, a group of coaches and TEXs, works or worked remotely.  (Lewis Aff. ¶ 3.)  The record, therefore, contains evidence challenging Defendant's contention that his onsite presence is an essential function of the job.  Whether the T-Force is a reasonable comparator or whether Plaintiff could perform the essential functions of the job when he is working remotely and some or all of his team members are onsite are questions that are not resolved by the summary judgment record.

Defendant nevertheless argues summary judgment is appropriate because Plaintiff failed to engage in the interactive process.  Under the ADA, both the employer and the employee are required "to engage in a meaningful dialogue, in good faith, for the purpose of discussing" potential reasonable accommodations.  *Ortiz-Martinez v. Fresenius Health Partners, PR, LLC*, 853 F.3d 599, 605 (1st Cir. 2017).  "If an employer engages in an interactive process with the employee, in good faith, for the purpose of discussing alternative reasonable accommodations, but the employee fails to cooperate in the process, then the employer cannot be held liable under the ADA for a failure to provide reasonable accommodations."  *E.E.O.C. v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 132 (1st Cir. 2014).  In other words, "the process requires open communication by both parties, and an employer will not be held liable if it makes 'reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed....' "

---

U.S. Equal Employment Opportunity Comm'n, What You Should Know About COVID-19 and the ADA, Rehabilitation Act, and other EEO Laws (Technical Assistance Questions and Answers ¶ D.16, Sept. 8, 2020).

*Enica v. Principi*, 544 F.3d 328, 339 (1st Cir. 2008) (quoting *Phelps v. Optima Health, Inc.*, 251 F.3d 21, 28 (1st Cir. 2001)).

Defendant contends that on several occasions in January 2020, Defendant attempted to engage in the interactive process with Plaintiff by meeting with Plaintiff to discuss and clarify the accommodation he was seeking. (DSMF ¶¶ 32, 42-43, 45, 75.) Although the record reveals that at least initially, Plaintiff might not have been specific as to why he was unable to work onsite, the record does not support Defendant's contention that as a matter of law Plaintiff failed to engage in the interactive process. The record includes evidence that as the result of communications with Defendant, Plaintiff provided additional information, including a report from his provider. Whether the additional information was sufficient to support Plaintiff's claim or whether, as Defendant argues, the information was contradictory and insufficient is an issue for the factfinder.[10]

**D.    Unlawful Termination of Employment**

Plaintiff alleges Defendant's decision to eliminate his job and thus terminate his employment was discriminatory. The record, however, contains no evidence to support the claim. The uncontroverted evidence is that the position was eliminated due to a merger with another company and that Plaintiff's position was part of a general reduction in force.

---

[10] Defendant also argues that Plaintiff's claim that Defendant's decision to grant Plaintiff leave in February 2020, rather than allow him to work remotely, violated the ADA, is unsupported by the record. To the extent Plaintiff asserts a claim that granting leave represents an independent basis for liability under the ADA, Plaintiff's claim fails. The information cited by Defendant to support the decision, which information includes documentation from Plaintiff's provider suggesting a leave might be appropriate, would be relevant to Plaintiff's claim that Defendant failed to accommodate his request to work remotely, but cannot serve as an independent basis for liability.

17

Furthermore, to the extent Plaintiff claims discrimination in connection with the termination of his employment, Plaintiff cites factors other than his disability as the bases of the discrimination. (DSMF ¶ 72.) Defendant is entitled to summary judgment on Plaintiff's unlawful termination claim.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court grant in part and deny in part Defendant's motion for summary judgment. I recommend the Court grant Defendant's motion as to Plaintiff's claims that Defendant violated Plaintiff's rights under the ADA in November 2019, that Defendant discriminated against him by granting Plaintiff a leave of absence in February 2020, and that Defendant unlawfully terminated Plaintiff's employment. I recommend the Court deny Defendant's motion on Plaintiff's claim Defendant failed to accommodate his January 2020 request to work remotely. I further recommend the Court deny without prejudice Defendant's motion as to Plaintiff's claim for unpaid wage replacement benefits.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen

(14) days of being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

      Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

      /s/ John C. Nivison
      U.S. Magistrate Judge

Dated this 19th day of January, 2023.